1                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
2

3

4   THE UNITED STATES OF AMERICA        )
                                        )
5   vs.                                 )
                                        )
6                                       )   No. 1:09-cr-10391-DPW-1
    RALPH F. DeLEO,                      )
7                                       )
                                        )
8                    Defendant.         )

9

10  BEFORE:  THE HONORABLE DOUGLAS P. WOODLOCK

11

12                 SENTENCING HEARING - DAY THREE

13

14

15           John Joseph Moakley United States Courthouse
                          Courtroom No. 1
16                       One Courthouse Way
                         Boston, MA 02210
17                       November 21, 2012
                            10:05 a.m.

18

19

20

21                  Brenda K. Hancock, RMR, CRR
                       Official Court Reporter
             John Joseph Moakley United States Courthouse
22                      One Courthouse Way
                         Boston, MA 02210
23                        (617)439-3214

24

25

```
1    APPEARANCES:

2        UNITED STATES ATTORNEY'S OFFICE
         By:  AUSA Timothy E. Moran
3        One Courthouse Way, Suite 9200
         Boston, MA 02210
4        On behalf of the United States of America.

5        FEDERAL PUBLIC DEFENDER OFFICE
         By:  Timothy G. Watkins, Esq.
6        51 Sleeper Street, 5th Floor
         Boston, MA 02210
7        On behalf of the Defendant.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (The following proceedings were held in open court

2    before the Honorable Douglas P. Woodlock, United States

3    District Judge, United States District Court, District of

4    Massachusetts, at the John J. Moakley United States Courthouse,

5    One Courthouse Way, Courtroom 1, Boston, Massachusetts, on

6    Wednesday, November 21, 2012):

7          THE CLERK:  All rise.

8       (The Honorable Court entered the courtroom at 10:05 a.m.)

9          THE CLERK:  This Honorable Court is now in session.

10   You may be seated.

11         This is Criminal Action 09-10391, United States versus

12   Ralph DeLeo.

13         THE COURT:  Well, I have received two communications

14   from Mr. DeLeo, and he asked me to make at least one of them

15   available because he had not been able to make copies for

16   Mr. Moran and for Mr. Watkins, and I understand that he is

17   asking me to include these in the record of the case on the

18   docket.

19         So, let me pass them back to counsel to see whether

20   they have seen them before, because they are matters that are

21   tendered to me in connection with the sentencing, as to which I

22   presumably will be relying in the sense if it is something I

23   have considered.

24         MR. MORAN:  Your Honor, I have not seen it before.  I

25   can review it right now, if I can have a moment.

1          THE COURT:  Maybe we will take a five-minute recess,

2    and you can continue to review it.

3          MR. MORAN:  Thank you, your Honor.

4          THE COURT:  All rise.

5      (The Honorable Court exited the courtroom at 10:05 a.m.)

6                    (Recess taken)

7          THE CLERK:  All rise.

8      (The Honorable Court entered the courtroom at 10:15 a.m.)

9          THE CLERK:  This Honorable Court is back in session.

10   You may be seated.

11         THE COURT:  So, apart from these apparent letters --

12   one is an e-mail, one is a letter -- are there any other

13   written materials I should have received?

14         MR. MORAN:  No, your Honor, not from the Government.

15         MR. WATKINS:  No, your Honor.  I think there was an

16   amended report from the BOP that arrived yesterday.  I don't

17   know if the Court has received that, but that would be the

18   other.

19         THE COURT:  I have not looked at it, if I have

20   received it.  Do you have a copy of it?

21         MR. MORAN:  I do, your Honor.  If I may approach?

22         THE COURT:  Yes.

23      (Document provided to the Court by AUSA Moran)

24         MR. MORAN:  Your Honor, I received that yesterday

25   morning.  I e-mailed a copy to Mr. Watkins and Mr. Lovett.

1        THE COURT:  I think that I just put it in the wrong

2   pile.

3        MR. MORAN:  Obviously, your Honor will want to read

4   it, but the substance is the same.  It's correcting some of the

5   errors that were noted.

6        THE COURT:  So, Mr. DeLeo is now 69?

7        MR. MORAN:  Yes, your Honor.

8        MR. WATKINS:  Yes.

9                  (Pause)

10        THE COURT:  All right.  I do not believe there are any

11   other outstanding issues to be resolved here now.

12        MR. MORAN:  No, your Honor.

13        THE COURT:  So, I will hear the Government on its

14   recommendation.  I have not yet accepted, obviously, the plea.

15        MR. MORAN:  Your Honor, the Government would request

16   that you do accept the plea and impose a sentence within the

17   range.  The Government's requesting a sentence of 235 months.

18   That's the top end of that range.

19        The first point I would like to make procedurally in

20   terms of the Plea Agreement, it is fairly complicated in terms

21   of the guideline range, and that was intentionally done so as

22   to be as transparent as possible for the Court.  The Government

23   recognizes that a (C) plea is not common, for understandable

24   reasons, and the Government wanted -- the parties, frankly,

25   wanted the Court to understand the thought process that was

1    incorporated in reaching that result for the Court so that you

2    are better able to evaluate whether the plea is appropriate.

3    That is particularly true where, what we caption a "departure,"

4    which your Honor may be correct is more properly termed a

5    "variance" with regard to the two-level enhancement for

6    obstruction.

7            In the Government's view this is a *Guidelines* case.

8    We want the Court to understand why we have come down somewhat

9    from where the *Guidelines* properly calculated it, and that's

10   because we viewed it as an anomalous result.

11           The point that I would like to make, your Honor, is

12   that we wanted this to be as transparent as possible to show

13   you exactly how we reached a number that was below the

14   *Guidelines*.  Mr. Watkins has also laid out in his papers the

15   way he views it as well, and I think this is all intended to

16   show your Honor -- to be as transparent as possible for your

17   Honor.  This Plea Agreement was a product of long, careful,

18   good-faith negotiations between the parties without

19   compromising the facts but lay them for you --

20           THE COURT:  The Government's recommendation of 235

21   months is within the *Guidelines* as calculated by the Probation

22   Office.

23           MR. MORAN:  I believe they reached a low end of 262.

24   I think that they did not --

25           THE COURT:  I am sorry.  That is right.

1          MR. MORAN:  It is with the one-level departure, what

2     we would caption a "departure," what may be more properly

3     captioned a "variance," of one level to deal with what we

4     viewed an anomalous result created by the obstruction based on

5     the attempted escape.

6          Having made that procedural point, your Honor, we do

7     think the 210- to 235-month sentence is appropriate in this

8     case.

9          I laid it out more carefully in my papers, but just to

10    summarize, if I may, briefly, I think it's safe to say of the

11    defendants who are regularly brought in this court, Mr. DeLeo

12    has to be among the most dangerous both on a personal basis and

13    organizationally.  The exhibits attached to the Sentencing

14    Memo, particularly the armada, the arsenal of weapons and

15    criminal history, frankly, speak for themselves.  They describe

16    a person who was both capable and equipped for great violence,

17    and it would be hard to exaggerate that.

18         But I also want to emphasize the organizational danger

19    presented by this man, and it really demonstrates why the

20    Government takes the threat of organized crime so seriously.

21    It is opportunistic.  The collection, the organization of

22    criminals collectively expands the resources and capabilities

23    for criminal activity.  It is what legitimate businesses I

24    think would term a synergy, but basically what you have got is

25    criminals combining their talents, experiences and abilities to

1    expand exponentially their capabilities for crime.

2         Particularly, in this case we see the threat to

3    legitimate business.  In no way meant to discount crime against

4    other criminals, but this a crime that has the ability to

5    corrode and erode the ability of legitimate businesses to

6    function and to do the things that we want them to do.

7         Finally, it's a great threat of violence.  All of this

8    happened with Mr. DeLeo at an age where recidivism rates

9    suggest that the rates have dropped sharply and would suggest

10   that he should no longer be involved in crime.  The only

11   conclusion the Government can draw is this is a consummate

12   criminal who is wholly devoted to crime.

13        I think in a case like this, frankly, your Honor, less

14   said is almost more.  I think the facts themselves are

15   striking.  Your Honor is very familiar with them at this point.

16        I think on this record a sentence of 210 to 235 months

17   is called for and is necessary.

18        THE COURT:  Let me be sure I understand the interplay

19   with the 33 months and the way in which a judgment would

20   actually be formulated here under the Government's

21   recommendation.

22        MR. MORAN:  I spoke to Probation about this again this

23   morning, your Honor, and I think it is actually 36 months.

24   Mr. DeLeo was arrested on November 16th, 2009.  So, we are

25   at --

1          THE COURT:  A little over.

2          MR. MORAN:  -- 36 months and five days.  5G1.3 is

3     directly applicable, because, as I understand it, and Probation

4     and certainly Mr. Watkins will correct me if I'm wrong,

5     Mr. DeLeo would not get credit towards this sentence for any

6     time previously spent in prison because that would be devoted

7     towards the Arkansas sentence, so BOP would not credit that.

8          However, the conduct in Arkansas, to the degree the

9     cocaine did factor in the guideline range here, because it was,

10    in fact, the highest level was the drug conduct.  So, the

11    conduct for which he is serving a sentence in Arkansas did

12    factor into the guideline range here, and he won't be credited

13    for that time, therefore, 5G1.3(b) is applicable, and the Court

14    should adjust downward by 36 months the sentence he receives.

15    It has always been the intention of the parties that --

16         THE COURT:  So, just to put it in concrete terms,

17    adopting the Government's recommendation would be 199 months.

18         MR. MORAN:  That's correct, your Honor.

19         THE COURT:  198 and 25 days.

20         MR. MORAN:  That's correct, your Honor.  It's always

21    been the intention of the parties that the sentence that your

22    Honor will give will be the controlling sentence and will

23    incorporate the entire period of incarceration.

24         THE COURT:  All right.

25         MR. MORAN:  One last housekeeping matter.  We also

1    filed a motion for order of forfeiture and requested -- the

2    Plea Agreement also provides for supervised release and a fine

3    of $50,000.

4         THE COURT:  Yes.

5         MR. MORAN:  Thank you, your Honor.

6         THE COURT:  All right.

7         Mr. Watkins.

8         MR. WATKINS:  Your Honor, likewise I am asking the

9    Court to accept the agreement and the range specified in the

10   Plea Agreement.  I am asking for a sentence at the low end of

11   that range, which would be the 210 months minus the 36 months.

12   Then, that would be a sentence of 174 months.  That would

13   actually appear in the judgment.

14        This is the third time for the hearing, the sentencing

15   hearing.  I have laid out I think four independent grounds, any

16   one of which I think justifies a departure or a variance and a

17   more significant departure or variance than the Government has

18   suggested is appropriate here.

19        I just do want to respond to a couple of things that

20   Mr. Moran said.  There is really no question that this is

21   serious.  We are not talking about a sentence of 5 or 10 or

22   even 15 years.  At the low end here that I am recommending is

23   17 1/2 years.  Really, the question is whether there is some

24   incremental gain between that and the 19 1/2 years that somehow

25   better reflects the seriousness of the conduct.

1          What I would note about this particular RICO

2     conspiracy is that there is not the allegation that there was

3     physical violence anywhere along the way.

4          What you see, despite the Government's repeated talks

5     about the organization and Mr. DeLeo's high position within, is

6     a person who was very hands-on with the specific predicate

7     acts.  In other words, this is not a person who is able to

8     control a large organization while putting aside the risk.  The

9     offenses that occurred here were things that Mr. DeLeo was

10    oftentimes directly involved, a couple of times just

11    peripherally involved, but, nevertheless, personally involved,

12    and they included such things as driving out and delivering

13    Chinese food.

14         There was quite a lot of surveillance here, and the

15    surveillance detailed what Mr. DeLeo principally was, which was

16    a worker for his brother doing a lot of maintenance around

17    apartments and the like.

18         So, it's certainly true that he was committing

19    offenses, and there is no question about that, and he has

20    admitted his guilt to that.  I do have to take issue about how

21    serious the offenses were and whether they really support a

22    further increase, and a further increase it is.

23         Without talking too much out of school, Mr. Moran is

24    quite right; we did have long and protracted negotiations, as

25    often happens.  There were a lot of factors going into

1     Mr. DeLeo's decision to plead guilty, but, indeed, we did go to

2     the Government and offer a plea of guilty in exchange for a

3     sentencing range that we have come to.

4          I should say initially, when we did talk about what

5     the right number was, the right number was 210 months, which is

6     what I am suggesting here.  But, of course, as often happens,

7     once we got into the nitty-gritty of how the *Guidelines* were to

8     work, we found out that they came out higher and, indeed, much

9     higher, and the Court can probably see where some of those, the

10    minutia of the *Guidelines* worked.

11         Some of the things I suggest with the armed career

12    criminal he gets rocketed up from Criminal History Category II

13    up to Criminal History Category VI.  That was not something we

14    initially apprehended was going to happen in quite that way.  I

15    am not criticizing the Government in what their ultimate

16    recommendation is and what they did here, only to say that 210

17    months is certainly within the range of reasonable sentences.

18    I think on a gestalt level we perhaps all thought that was true

19    at the beginning of the case.  I certainly still think it is

20    true, and for the reasons I have said there, I do think the

21    Court should impose the sentence of 17 1/2 years.

22         It may at some level be a very arcane kind of

23    discussion we are having.  Mr. DeLeo is not in good health, as

24    the Court has seen, and it may be that this is all a little bit

25    of a nullity here.  But to the extent he has some kind of

1   productive years at the end his life, I would ask the Court to

2   consider that and to consider all we have seen with Bureau of

3   Prisons to at least give him that chance of some kind of health

4   in his declining years outside the confines of a prison

5   sentence.

6          I would make two additional requests.  Hopefully, it

7   is not needed here, but I would ask the Court to specifically

8   recommend a medical designation for Mr. DeLeo.  One would hope

9   that at this point Bureau of Prisons is quite aware of that.

10          The second is that the Court recommend that he be

11   transferred to FMC Devens while he awaits classification by the

12   Bureau of Prisons.  As the Court heard last time, he did go to

13   Wyatt Detention Facility.  That's where he has been.  His blood

14   pressure has been somewhat under control, still quite high.

15   There are still issues with diet that Mr. DeLeo has down there.

16   It is certainly not the kind of care he would be able to get at

17   a medical center and certainly not the kind of care he was able

18   to get at FMC Devens.  Again, one would hope that the Bureau of

19   Prisons would understand that that is the right thing to do,

20   but a recommendation by the Court may be the tipping point on

21   that.

22          And, of course, the judgment should recommend that the

23   time is concurrent with the specific docket number in Arkansas,

24   and I believe the Clerk has that, or it is certainly in my

25   papers.

1          THE COURT:  All right.

2          Mr. DeLeo, I will hear from you.  Of course, I have

3    read those two communications that you gave me, but this is an

4    opportunity to speak directly to me.

5          MR. WATKINS:  Just a moment, your Honor.

6      (Atty. Watkins conferred with the defendant off the record)

7          THE DEFENDANT:  Yes, your Honor.

8          Your Honor, I would like to apologize to this Court

9    and my family for whatever role I played in being in this

10   courtroom today.

11         As I stated in my written statements to the Court that

12   were mailed on November 6th and 16th, that I hoped to avoid

13   airing my allegations concerning Agent Richards in open court.

14   However, having read the Government's Sentencing Memorandum for

15   the first time last night, I feel I must bring this to the

16   attention of the Court.

17         I found the Government's Sentencing Memorandum so

18   seriously fundamentally flawed that the Court should disregard

19   its entirety.  Since the Assistant U.S. Attorney contributes

20   its maliciously false and misleading content directly to Agent

21   Richards, it adds credence to my allegations that Agent

22   Richards' credibility and motives in this case are highly

23   questionable and deserves outrageous government conduct

24   hearing.

25         There are a number of serious false and misleading

1    statements in the Government's Sentencing Memorandum.  The

2    Government stated in its memorandum that I have shot and killed

3    a correctional officer on May 11th, 2011.  It is utterly false

4    and incomprehensible a mistake of that magnitude could be made.

5          The Government also stated in their Sentencing

6    Memorandum that I cooperated with the Government.  That is also

7    blatantly false.  I did testify in the State of Ohio that I,

8    alone, committed a crime to three innocent parties, including

9    one Michael Washington, who was being framed by the police.  I

10   accepted responsibility for my actions and freed an innocent

11   party.  For that reason alone I received a sentence commutation

12   by the Governor of Ohio.

13         Agent Richards threatened to have me killed in prison

14   and indicted in Boston if I refused to cooperate.  He knowingly

15   released misinformation in furtherance of his threat to

16   endanger my life in prison.  Agent Richards made the same

17   threat and took similar action as his predecessor, ex-Agent

18   John Connolly.  The Government has perpetuated these falsehoods

19   in their Sentencing Memorandum.  I request an outrageous

20   government conduct hearing to be held and that the Government's

21   Sentencing Memorandum be corrected before this Court proceeds

22   or that the Court totally disregards it and strickens it from

23   the record.

24         In the Sentencing Memorandum the Government speaks of

25   a general deterrence without being greater than necessity.  As

1   the Court is well aware, the defendant suffers from chronic

2   hypertension associated with deadly consequences.  The

3   Assistant U.S. Attorney is aware that a 210- to 235-month

4   sentence is probably a death sentence for this defendant.  He

5   is asking the Court to sentence me to life.  It is

6   contradictory for him to speak of not asking for a sentence

7   that is greater than necessity to achieve its goal of

8   punishment and deterrence when he is basically requesting the

9   Court to sentence me to life.

10         Your Honor, I ask the Court to consider my age, health

11  and Agent Richards' threats to have me killed in prison and his

12  actions in furtherance of that threat against my life for

13  exercising my right to remain silent in determining the Court's

14  sentence.

15         Thank you for your time and indulgence.

16         THE COURT:  Thank you.

17         Mr. Moran, do you want to speak to the correction

18  officer issue, as you understand it?

19         MR. MORAN:  I don't believe I wrote in my Memo that he

20  attempted to shoot a corrections officer.  As I understand the

21  facts, Mr. DeLeo was brought into a -- he was at the time

22  housed at a facility in West Tennessee, was brought to a

23  hospital or some kind of clinic.  A gun was placed down in his

24  proximity.  He took the gun in an attempt to escape and pointed

25  the gun at a correctional officer.  Another correctional

1   officer came into the room and tackled Mr. DeLeo.  The gun was

2   recovered and he was returned to custody.

3           THE COURT:  Whose weapon was it?

4           MR. MORAN:  The weapon belonged to one of the

5   corrections officers, your Honor.  As I understand it, the gun

6   was placed on a table so that the corrections officer could

7   free her hands to remove either his leg irons or handcuffs.

8           THE COURT:  Was this the State of Tennessee

9   correctional officers?

10          MR. MORAN:  No, your Honor.  It was --

11          THE COURT:  CCI?

12          MR. MORAN:  CCA, your Honor, that's correct.  As I

13  understand it, he at that point would have been in the custody

14  of the Marshal for the Eastern District of Arkansas.  I

15  understand that's in close proximity to Western Tennessee, and

16  they must have a contract with the CCA facility in Mason,

17  Tennessee.

18          THE COURT:  Well, as Mr. Moran indicated, (C) pleas

19  are unusual and, at least in my experience, not always granted.

20  I have not kept track.  I keep saying that I have not kept

21  track.  I should probably start doing so.  But I would think in

22  at least half of the (C) pleas that I am presented with I turn

23  them down, and the reason is that a (C) plea, from my

24  perspective, is an indication that the parties are

25  uncomfortable with the exercise of independent judgment on the

1    part of the Court.

2         But the standard that I use is, is the range a

3    reasonable one, and in evaluating the rather complex set of

4    circumstances of this case, I am satisfied that it is a

5    reasonable one.  I understand that with the development of the

6    Presentence Report the guidelines started to accumulate points

7    that led to more extended guideline ranges than the parties had

8    fully contemplated.  But that reflects, to some degree, I

9    think, the cumulative, if not exponentially cumulative, quality

10   of the guidelines of the upper ranges.

11        So, the short of it is, I accept the defendant's plea

12   and impose a sentence within the range contemplated by the

13   parties.  Now the question is where to put that and how to

14   characterize it.

15        I start out by characterizing it as a variance.  It is

16   not really within the contemplation of the *Guidelines*, as

17   diligent and, appropriately so, as the parties were in trying

18   to calculate them, but it is a recognition that the *Guidelines*

19   in this particular circumstance simply do not capture the

20   nature and extent of the criminal conduct and the character and

21   life experience of the defendant and the particulars of the

22   interplay between the case in Arkansas and the case here.

23        Ultimately, while I have said that the range is

24   reasonable and I also indicated that there is a tendency toward

25   inflation of guidelines at the upper reaches, I am satisfied

1    that the upper range of the recommendation or agreement between

2    the parties is the proper one, and, consequently, I am going to

3    impose a sentence of 199 months in prison.  That will be

4    concurrent, as the parties have indicated, with the Arkansas

5    case.

6            I will impose, as requested and recommended, a $50,000

7    fine.  There is a $200 Special Assessment.  There will be a

8    period of 3 years of supervised release.

9            Let me explain this, as I must generally with

10   sentences, but more particularly in the case of a variance

11   sentence in terms of the considerations of Section 3553.

12           The first has to do with the nature and seriousness of

13   the offense.  Now, I am not inclined to treat a RICO charge and

14   the label that is associated with it as determinative, but it

15   seems to me that this is not an improper charging determination

16   to capture the quality of the criminal activity that is the

17   subject of this case.  Is it the most serious RICO case I have

18   ever seen or been around?  No, it is not, in part because it

19   was inchoate.  There is not physical harm, in part, I should

20   think, because it was interrupted before that kind of harm

21   could be visited.

22           Within the contemplation of the RICO statute, it seems

23   to me to be core RICO activity, which is treated with real

24   seriousness by the *Guidelines* and I think properly by the

25   Courts, and I treat it that way.

1          I then turn to the nature and circumstances of the

2     defendant, and in the case of Mr. DeLeo it is clear to me that

3     this was a crime for which there was a lifetime of preparation.

4     There is a consistent criminal history with Mr. DeLeo for a

5     very long time and extending into that time period where others

6     are thinking of reasonable retirement from whatever vocation

7     they have chosen.  Mr. DeLeo did not.  His approach, it seems

8     to me, has been one of pursuing a life of crime in various

9     contexts of which this is perhaps the most recent version of

10    that.

11         Now, I have received several letters from individuals.

12    I have in mind Mr. Goldman's argument, I guess I would say, in

13    sentencing.  This is a kind of reverse English on this, but a

14    recognition that Mr. DeLeo had, after the statute of

15    limitations ran, been prepared to accept responsibility for

16    other criminal activity, and so one can say, well, Mr. DeLeo is

17    a stand-up guy.  That has connotations in a variety of

18    different contexts.  The context here is he is a stand-up guy

19    on behalf of persons who are accused of a crime when he,

20    himself, has been involved in it.  That is not altogether

21    exculpatory.

22         But I do have letters from individuals which I credit,

23    saying that he was a person who was kind to them and prepared

24    to be of assistance outside of the perverse incentive system of

25    the criminal justice process, and I treat that as true.  There

1    is nothing altogether black in Mr. DeLeo's life.

2            I also have considered the allegations with respect to

3    the pressure that the FBI is alleged to have placed on

4    Mr. DeLeo.  In some sense I am not surprised by the idea of

5    trying to provide encouragement to cooperate with the

6    Government in some meaningful sort of way.  Mr. DeLeo is not

7    inclined to do that, and it may be that the interplay was one

8    that led to abrasions between the two parties and perhaps led

9    to overreaching in some larger sense, although I reject the

10   idea that I am dealing here with outrageous government conduct.

11   I am dealing with circumstances in which a stand-up guy resists

12   the importunings of the government and then presents it as some

13   grounds for departure.

14           But Mr. DeLeo is being sentenced for his own crimes,

15   not for failing to cooperate with the Government, although,

16   were he to do so, presumably the Government's recommendation

17   would be different.  But that is a matter of indifference to me

18   at this point in this case, except to note that Mr. DeLeo feels

19   the way he feels and has expressed a belief that he is entitled

20   to some sort of hearing with respect to outrageous conduct and

21   that it should influence the sentence that I impose now.  It

22   does not.

23           I have listened a bit about the question of the

24   attempted escape.  I have received more and more information,

25   including today, that puts it in context.  On the other hand, I

1    do not view it as a pressure to commit suicide, as Mr. DeLeo

2    has effectively characterized it, at least on one occasion,

3    but, rather, as Mr. DeLeo making his own calculus about risk

4    and reward in continued custody, and that factors in, in my

5    sense, that this is a person entirely unrepentant, prepared to

6    blame others for his circumstances rather than to accept fully

7    the responsibility that he bears with the life that he has led.

8           I turn to the question of individual deterrence,

9    specific deterrence.  This is the question of what do we have

10   to do to keep Mr. DeLeo from committing crimes?  It appears

11   that we have to keep him in jail, and so the length of the

12   sentence here seems to me to be appropriate to that goal.

13          I look at the question of general deterrence, the idea

14   that sentences send messages in some way and provide an

15   information market for those who might otherwise consider doing

16   what Mr. DeLeo has done.  That is an imperfect and perhaps even

17   specious metaphor, but it does indicate what it is that we are

18   trying to do in this area, or, more accurately, what Congress

19   has directed the Courts to do in this area, and it seems to me

20   that it would be, frankly, corrosive of general deterrence for

21   the sentence to be any less.

22          I have in mind the principal of parsimony, to which

23   Mr. DeLeo made reference, the idea that a sentence should be no

24   greater but sufficient to serve all of the purposes, and it

25   seems to me under these circumstances the sentence that I have

1  chosen from those that are in the range that the parties have

2  negotiated is the proper one to tell people that there are

3  costs to living this kind of life, engaging in this kind of

4  activity, that get paid; and while there is an adjustment for

5  the interplay between the Arkansas case and this case, this

6  case justifies a very substantial sentence, which is what this

7  is.

8       I turn to the question of what I can call "penological

9  benefit" or what is the impact of prison.  Is it deleterious?

10 Well, here we had a course in prison bureaucracy in the

11 designation process.  My own view about the way in which the

12 Bureau of Prisons has responded here is that it was

13 bureaucratic, indifferent to the defendant's documented medical

14 needs, serving only their own view about how it is that one

15 goes about designating, that it takes a long time and it should

16 not, and it could have been short-changed, but it was not.  But

17 does that impact my view about what the sentence should be?

18 Ultimately, no.

19      The Bureau of Prisons will bear the responsibility, if

20 responsibility has to be borne, for anything that happens here.

21 They should not have done it that way.  While I am not

22 effectively washing my hands of this, it is beyond the control

23 of the Court.  Institutions begin as efforts to address human

24 problems and they end as efforts to protect themselves, and

25 that is what was involved here, I think, is involved here with

1    the Bureau of Prisons' designation process, which, not to

2    extend or make rich the metaphor, but I view it as a sclerotic

3    process that serves only the bureaucratic needs of those who

4    are affiliated with the bureaucracy.

5        But, ultimately, Mr. DeLeo will be designated to a

6    facility if the recommendation is one that would lead to a

7    federal medical center, I believe, and there is on the record

8    now a very substantial basis for even bureaucrats to be

9    concerned about their own personal interest, should something

10   untoward befall Mr. DeLeo.

11       But Mr. DeLeo will go to prison and he will do his

12   time I suspect the way those who have a long-term experience in

13   crime do their time, which is quietly, without a great deal of

14   disruption of the institution, leading wardens to view inmates

15   like Mr. DeLeo as not as problematic as some of their inmates.

16       Are we talking here about additional vocational

17   training?  Of course not.  Additional educational training?  Of

18   course not.  Although, Mr. DeLeo strikes me as a person of

19   sufficient intelligence to understand that it is in his own

20   best interest to keep his mind agile through taking programs.

21   But, ultimately, apart from those observations about the way in

22   which the prison system has received Mr. DeLeo and will deal

23   with Mr. DeLeo, I view the penological benefit as a neutral

24   factor.

25       Finally, I turn to the question of disparity.  Over an

1    extended period of time I have had some exposure to the range

2    and kinds of cases that are customarily brought in the federal

3    court and the kinds of sentences that are imposed, and while I

4    have characterized this as a variance, and it is in the formal

5    sense, this strikes me as a sentence that is consistent with

6    similar sentences involving persons with similar backgrounds

7    who come to the federal court.  The dangerous thing is some

8    judicial action that undercuts the consistency of crimes either

9    by sentences that are far too low for real crime or far too

10   high or are perceived as being incentives to a defendant to

11   attempt to ameliorate the sentence either before or after by

12   cooperation.

13         Mr. DeLeo, for his own sufficient reasons, which he

14   has spread on the record so that anyone in the prison system

15   who comes upon his sentence will be able to see that he told

16   the judge that he was a stand-up guy, has chosen not to

17   cooperate.  That is his choice.  It does not factor into my

18   sentence.

19         You are receiving a sentence that I think, Mr. DeLeo,

20   is appropriate under the circumstances for the actions that you

21   have engaged in here and the background that you bring to bear,

22   and it is a sentence that I think is not disparate but

23   consistent with the kinds of sentences that are imposed for

24   people who are RICO violators in the later decades of their

25   lives after being violators of various kinds earlier on.

1          Now, I did say that there is a 3-year period of

2     supervised release.  I understand the argument that the

3     sentence is very long and Mr. DeLeo's medical condition is

4     vulnerable, but the sentence is not imposed to create a life

5     sentence.  It is a sentence for a term of years, and it leads

6     to a period of supervised release, and that period of

7     supervised release, as I have indicated, will be 3 years,

8     consistent with the parties' recommendation

9          The defendant is obligated, as I have indicated, to

10    pay a fine of $50,000.  The fine is due immediately.  If it is

11    not paid immediately, it will be paid, in part, as will the

12    $200 Special Assessment, through a prison financial

13    responsibility program, and if it is not paid there, then it

14    will be paid subject to the development of a program of

15    installment payments that Probation will initially formulate

16    for my approval.

17         So long as the defendant under the period of

18    supervised release has not paid his fine, he is obligated to

19    provide whatever financial information the Probation Office

20    wants, to recognize that that information can be shared with

21    the Financial Investigation or Credit Unit, I guess, of the

22    United States Attorney's Office, and that he cannot open any

23    additional lines of credit without the express approval of the

24    Probation Office.

25         In addition to the mandatory conditions of

1    supervision, a couple of which I want to emphasize, that is,

2    that the defendant not commit another federal, state or local

3    crime, and not illegally possess a controlled substance, but

4    the defendant is prohibited from possessing a firearm,

5    destructive device or other dangerous weapon.

6         Here the argument was made to me that what accelerated

7    the very high sentence here was just one weapon.  It only takes

8    just one weapon, it is a serious one, and the defendant should

9    understand that maintaining an arsenal is inconsistent with

10   supervised release and will lead to violation if he does so.

11        I do waive the drug-testing requirement here, because

12   that does not seem to be part of Mr. DeLeo's presentation of

13   difficulties.

14        Are there any other matters that the parties would ask

15   me to address?

16        MR. MORAN:  Your Honor, would you grant the Motion for

17   Forfeiture and include that as part of the sentence?

18        THE COURT:  Yes, I do, and I will execute it today.  I

19   have not done so prior to this hearing.

20        MR. MORAN:  And, finally, it may be appropriate to

21   seal Mr. DeLeo's submissions to the Court today.  I think he

22   presented them in that manner so --

23        THE COURT:  They are harsh, but Mr. DeLeo has asked me

24   to consider them, and he has referenced them, and he indicated

25   in his statement that he was prepared to have them put on the

1    record, again, apart from his own views about their merits as I

2    am sure a way of illustrating that he has not cooperated in any

3    fashion with the Government so that his fellow inmates will

4    understand that, as if they would not.  So, absent something

5    else, I am not going to seal it.  I recognize that it makes

6    charges against a federal agent, but that sometimes happens in

7    court documents.

8           MR. MORAN:  Thank you.  There is nothing further from

9    the Government, your Honor.

10          MR. WATKINS:  Your Honor, I just want to make clear

11   for the record concerning the fine.  The Plea Agreement

12   anticipated the money for the fine is actually in the

13   Government's hands.  It was recovered as part of the items

14   seized.  It is not subject to the forfeiture, though.  That is

15   the reason that we established that particular fine.  It is by

16   way of saying right now the Government has that money.

17          I don't know what the procedure will be for getting it

18   from the Government to the Clerk's Office, but to the extent it

19   impacts Mr. DeLeo in the financial responsibility program, I

20   want to make clear that at some point, sooner rather than

21   later, that fine should be paid, and I think the means to do so

22   is within the Government's control.

23          MR. MORAN:  That's right, your Honor.

24          THE COURT:  It strikes me as not dissimilar from

25   Mr. Goldman's situation and his fine.

1          MR. MORAN:  Exactly, your Honor.

2          THE COURT:  Anything further?

3          MR. WATKINS:  Also part of the Plea Agreement,

4   Mr. DeLeo reminds me the total of $60,000 was seized.  There is

5   a $10,000 fine in Arkansas.  That is also to be paid in some

6   manner from that money.

7          MR. MORAN:  I think it's actually $50,000 was seized

8   and the first $10,000 would go to the United States District

9   Court for the Eastern District of Arkansas.  The remainder will

10  be delivered to the Clerk of this Court.  That's all in the

11  Plea Agreement, your Honor.

12         THE COURT:  Right.  I have raised issues about what

13  happens if it does not get there, but the suggestion is that it

14  is in the Government's control.  In any event, these provisions

15  of supervised release remain the same.

16         Mr. DeLeo, you should understand you have a right of

17  appeal.  I have not waived your appeal right here.  You will

18  want to talk to Mr. Watkins about whether that makes any sense

19  under these circumstances.

20         If there is nothing further, then we will be in

21  recess.

22         THE CLERK:  All rise.

23      (The Honorable Court exited the courtroom at 11:00 a.m.)

24      (WHEREUPON, the proceedings adjourned at 11:00 a.m.)

25

1                     C E R T I F I C A T E

2

3

4           I, Brenda K. Hancock, RMR, CRR and Official Reporter

5    of the United States District Court, do hereby certify that the

6    foregoing transcript constitutes, to the best of my skill and

7    ability, a true and accurate transcription of my stenotype

8    notes taken in the matter of *United States of America v. Ralph*

9    *DeLeo*, No. 1:09-cr-10391-DPW-1.

10

11

12

13

14

15   Date:  March 5, 2013          s/ *Brenda K. Hancock*

16                                 Brenda K. Hancock, RMR, CRR

17                                 Official Court Reporter

18

19

20

21

22

23

24

25